ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :

           - v. -                 :     **INDICTMENT**

JAMES GATTO,                      :     17 CRIM 686
    a/k/a "Jim,"
MERL CODE, and                    :
CHRISTIAN DAWKINS,
                                  :     ┌─────────────────────────┐
           Defendants.                  │ USDC SDNY               │
                                  :     │ DOCUMENT                │
                                        │ ELECTRONICALLY FILED    │
- - - - - - - - - - - - - - - - - x     │ DOC #:                  │
                                        │ DATE FILED: NOV 0 7 2017│
                                        └─────────────────────────┘

                        **Overview**

        1.    The charges in this Indictment result from a scheme to
pay bribes to amateur student-athletes bound for National
Collegiate Athletic Association (the "NCAA") Division I
universities, and the families of such athletes, in exchange for
a commitment by those athletes to matriculate at specific
universities and then retain the services of the bribe-payors
once the athletes enter the National Basketball Association
("NBA").  The bribe-payors included financial advisors, business
managers, and individuals employed by and affiliated with a
global athletic apparel company ("Company-1").

        2.    As alleged herein, JAMES GATTO, a/k/a "Jim," the
defendant — an executive at Company-1 — and MERL CODE, the
defendant — a consultant for Company-1 and its high school and
college basketball programs — conspired with coaches for

universities sponsored by Company-1 to make payments to high school basketball players and/or their families in exchange for commitments by those players to attend and play for the Company-1-sponsored universities, and to sign with Company-1 upon turning professional. In addition, CHRISTIAN DAWKINS, the defendant, along with a co-conspirator not named as a defendant herein ("CC-1"), brokered and facilitated the corrupt payments, in exchange for a promise that the players also would retain the services of DAWKINS, a business manager, and CC-1, a financial advisor, upon turning professional.

3.    The scheme described herein served to defraud the relevant universities in several ways.   First, by virtue of accepting and concealing payments that, if uncovered, would render them ineligible to participate in Division I basketball, the student-athletes and/or their family members conspired with coaches and apparel company executives and/or consultants to obtain athletic-based financial aid for the student-athletes from NCAA Division I universities through false and fraudulent means. Indeed, the defendants and their co-conspirators knew that, for the scheme to succeed and the athletic scholarships to be awarded such that the athletes could play at an NCAA Division I university, the student-athletes and coaches described herein had to falsely certify to the universities that they were unaware of any rules

2

violations, including the illegal payments.   Second, the scheme participants further defrauded the universities, or attempted to do so, by depriving the universities of significant and necessary information regarding the non-compliance with NCAA rules by the relevant student-athletes and coaches.   In doing so, the scheme participants interfered with the universities' ability to control their assets and created a risk of tangible economic harm to the universities, including, among other things, decision-making about the distribution of their limited athletic scholarships; the possible disgorgement of certain profit-sharing by the NCAA; monetary fines; restrictions on athlete recruitment and the distribution of athletic scholarships; and the potential ineligibility of the universities' basketball teams to compete in NCAA programs generally, and the ineligibility of certain student-athletes in particular.

### Relevant Entities

4.   At all relevant times, Company-1 was a multi-national corporation that designs and manufactures shoes, clothing, and accessories for multiple sports, including basketball.   Company-1 sponsors numerous high school, college, and professional basketball programs, including a program for amateur pre-college athletes, and sponsors the athletic programs of a number of universities that regularly have top-ranked NCAA Division I men's

basketball teams, including the University of Louisville and the University of Miami.

5. At all relevant times, the University of Louisville was a public research university located in Kentucky that, in each year relevant to this Indictment, received funds from the federal government in excess of $10,000 per year. At all relevant times, the University of Louisville fielded multiple varsity sports teams in NCAA Division I competition, including men's basketball.

6. At all relevant times, the University of Miami was a private research university located in Florida that, in each year relevant to this Indictment, received funds from the federal government in excess of $10,000 per year. At all relevant times, the University of Miami fielded multiple varsity sports teams in NCAA Division I competition, including men's basketball.

## The Defendants and Relevant Individuals

7. At all times relevant to this Indictment, JAMES GATTO, a/k/a "Jim," the defendant, was the head of Global Sports Marketing – Basketball for Company-1. In that capacity, GATTO oversaw significant components of Company-1's high school and college basketball programs, including a multi-million dollar annual budget, and facilitated payments to players and their families as

4

a part of the scheme described herein.

8.   At all relevant times, MERL CODE, the defendant, was a consultant for Company-1 and its high school and college basketball programs.   In that capacity, CODE worked directly with amateur and college basketball coaches and players and facilitated payments to players and their families as a part of the scheme described herein.

9.   From in or about 2015 until in or about May 2017, CHRISTIAN DAWKINS, the defendant, worked for a sports management company ("SMC-1").   DAWKINS was not a registered sports agent, and his work at SMC-1 primarily consisted of recruiting athletes as clients and maintaining client relationships for SMC-1.   In or about May 2017, SMC-1 terminated DAWKINS in connection with DAWKINS's alleged misuse of an athlete's credit card to pay for expenses from a ride services company without the athlete's authorization.   Beginning in May 2017, DAWKINS endeavored to start his own sports management business with CC-1, among others.

10.   At all relevant times, CC-1 was a registered investment advisor and the founder of an investment services company in New Jersey.

11.   At all relevant times, another co-conspirator not named herein ("CC-2") was affiliated with an amateur, high school-aged basketball team sponsored by. Company-1 that participated in the

"AAU," an amateur basketball league.

## Background on the NCAA and Relevant NCAA Rules

12.   The NCAA is a non-profit organization headquartered in Indianapolis, Indiana, which regulates athletics for over 1,000 colleges and universities, conferences, and other associations. NCAA member schools are organized into three separate Divisions: Division I, Division II, and Division III.   The University of Louisville and the University of Miami both are in NCAA's Division I, which is the highest level of intercollegiate athletics sanctioned by the NCAA.

13.   Division I schools typically have the biggest student bodies, manage the largest athletics budgets and offer the most athletic scholarships.   Among other things, Division I schools must offer a minimum amount of financial assistance (in the form of scholarships) to their athletes; however, at all times relevant to this Indictment, the NCAA set a maximum number of scholarships available for each sport that a Division I school could not exceed. Teams could offer no more than 13 athletic scholarships for the 2017-2018 men's basketball season.

14.   At all times relevant to this Indictment, the official rulebook governing Division I schools was the NCAA Division I Manual (the "Manual"), which is published annually and which contains the NCAA Constitution and its operating bylaws (the

"Bylaws"). Among the NCAA's core principles for the conduct of intercollegiate athletics was a directive that "[s]tudent-athletes shall be amateurs in an intercollegiate sport" and that "student-athletes should be protected from exploitation by professional and commercial enterprises." The Constitution further stated that "an institution found to have violated the [NCAA]'s rules shall be subject to disciplinary and corrective actions as may be determined by the [NCAA]."

15. Consistent with the NCAA's core principles, any financial assistance to student-athletes other than from the university itself or the athletes' legal guardians was prohibited without express authorization from the NCAA. In addition, neither student-athletes, prospective student-athletes, nor their relatives could accept benefits, including money, travel, clothing or other merchandise directly or indirectly from outside sources such as agents or financial advisors.

16. At all relevant times, the NCAA Division I Bylaws defined an "agent" broadly as "any individual who, directly or indirectly, . . . seeks to obtain any type of financial gain or benefit . . . from a student-athlete's potential earnings as a professional athlete." Specifically included in the definition of "agent" was, among others, "a certified contract advisor, financial advisor, marketing representative, brand manager or anyone who is employed

or associated with such persons."

17. At all relevant times, a student-athlete was rendered "ineligible" to participate in Division I sports if the athlete was recruited by a university or any "representative of its athletics interests" in violation of NCAA rules.

18. At all relevant times, coaches and other team staff at NCAA Division I schools also were subject to various prohibitions, including on (i) facilitating contact between student-athletes and agents or financial advisors; and (ii) receiving compensation directly or indirectly from outside sources with respect to any actions involving the student-athletes.

19. At all relevant times, student-athletes, coaches, and staff members of university athletics departments were required to complete annual certifications regarding their knowledge of NCAA rules violations, and, in the case of student-athletes, their continued eligibility to participate in NCAA-sponsored sports.

20. At all relevant times, a student-athlete was required to, on an annual basis, "sign a statement . . . in which the student-athlete submits information related to eligibility, recruitment, financial aid, [and] amateur status," which is known as the "Student-Athlete Statement."  In the Student-Athlete Statement, the student-athlete represented, among other things, that "[a]ll information provided to the NCAA . . . and the

institution's admissions office is accurate and valid, including
. . . [his] amateur status" and that the student-athlete had
"reported to [his] director of athletics . . . any violations of
NCAA regulations involving [him] and [his] institution."
Furthermore, in signing the Student-Athlete Statement, the
student-athlete certified that "to the best of [his] knowledge,
[he] ha[d] not violated any amateurism rules," and had "not
provided false or misleading information concerning [his] amateur
status to the NCAA . . . or the institution's athletics
department."

21.    At all relevant times, coaches and staff members were
required to certify annually that they had reported to their
university any knowledge of violations of NCAA rules involving
their institution.

22.    In addition, at all relevant times, the Bylaws
prohibited student-athletes, coaches and staff members of
athletics departments from "knowingly furnishing or knowingly
influencing others to furnish the NCAA or the individual's
institution false or misleading information concerning an
individual's involvement in or knowledge of matters relevant to a
possible violation of an NCAA regulation."

23.    As set forth in the Bylaws, violations of NCAA rules by
a university or any individual may lead to penalties including,

but not limited to, limitations on a university's "participation in postseason play in the involved sport"; financial penalties including "requirements that an institution pay a fine, return revenue received from a specific athletics event or series of events, or . . . reduction[s] in or elimination of monetary distribution by" the NCAA; "limitations on the number of financial aid awards that may be provided" by the university to student-athletes; and recruiting restrictions including on the ability to conduct off-campus recruiting activities or to communicate by telephone or letter with prospective student-athletes.

## Allegations Related to the University of Louisville

24.   Beginning in approximately May 2017, and continuing into at least September 2017, JAMES GATTO, a/k/a "Jim," MERL CODE, and CHRISTIAN DAWKINS, the defendants, CC-1, and others known and unknown, conspired to illicitly funnel approximately $100,000 from Company-1 to the family of an All-American high school basketball player.  The payments were intended to assist one or more coaches at the University of Louisville in securing the student-athlete's commitment to play basketball at the University of Louisville, a school sponsored by Company-1, and to further ensure that the student-athlete ultimately retained the services of DAWKINS and signed with Company-1 upon entering the NBA.

25.   The plan to funnel $100,000 in payments to the student-

athlete and/or his family that is described herein was formulated by JAMES GATTO, a/k/a "Jim," and CHRISTIAN DAWKINS, the defendants, at the request and with the assistance of one or more coaches at the University of Louisville, in or around May 2017, after most of the top high school basketball recruits from the Class of 2017 had already committed to various universities. At the time, the student-athlete, who was considered one of the top recruits in his class, had not yet committed to a particular university.  On or about June 3, 2017, the student-athlete publicly announced his intention to enroll at the University of Louisville and to play for its NCAA Division I men's basketball team.

26.  The scheme participants agreed to conceal the $100,000 bribe payment, which was to be made to the student-athlete's father, in four cash installments of $25,000 each, by causing the money to be transferred indirectly from Company-1 to third parties who then facilitated the cash payments to the student-athlete's family.  In particular, JAMES GATTO, a/k/a "Jim," and MERL CODE, the defendants, agreed to and caused the first two $25,000 installments to be wired by Company-1 pursuant to sham invoices to an organization under CODE's control, from which the bribes were then funneled to an account controlled by CHRISTIAN DAWKINS, the defendant. DAWKINS, in turn, was responsible for delivering the bribe payments to the athlete's father.  In particular:

11

a.    On or about July 10, 2017, CODE spoke by telephone with CC-1, among others, about the payments to the student-athlete's family.  During the call, CODE explained the involvement of Company-1 in funneling money to the athlete's family, noting that "this is one of those instances where we needed to step up and help one of our flagship schools in [the University of Louisville], you know, secure a five star caliber kid.  Obviously that helps, you know, our potential business. . . and that's an [Company-1-sponsored] school."  CODE explained that Company-1 was having difficulty generating the funds to pay the first installment of the bribe money because of internal "processes" at Company-1 and asked DAWKINS and CC-1 to cover the first $25,000 payment, with the understanding that they would ultimately be reimbursed by Company-1.

b.    Consistent with the call described above, on or about July 13, 2017, the father of the student-athlete traveled through the Southern District of New York to receive the first bribe payment, which he did during a meeting with CC-1 in Newark, New Jersey.  In a subsequent telephone call with DAWKINS, CC-1 informed DAWKINS that, based on CC-1's conversation with the father at the time of the handoff, CC-1 believed that the father would cause the athlete to sign with DAWKINS and CC-1 upon entering the NBA.

c.  On a telephone call in or around July 24, 2017, DAWKINS and CODE discussed how GATTO and others at Company-1 were accounting for the unlawful transfer of funds to the athlete's family by booking it on Company-1's records as a payment to an outside organization affiliated with CODE.  On the call, CODE confirmed that GATTO had identified the payments on Company-1's books "as a payment to my team, to my organization, so it's on the books, [but] it's not on the books for what it's actually for."

d.  On or about August 1, 2017, GATTO approved a sham invoice for $30,000 from Company-1 to an AAU team managed by CODE. GATTO and CODE concealed the true purpose and destination of the payment by describing it on the Company-1 invoice as "July Travel Team Expenses" for the AAU team.  After the payment was wired by Company-1 to a bank account in the name of the AAU team, CODE caused $25,000 of the funds to be paid to DAWKINS as reimbursement for the first bribe payment made to the student-athlete's father, as described above.

e.  On or about September 18, 2017, Company-1 wired another $25,000 to the same AAU team account associated with CODE pursuant to a second sham invoice, approved by GATTO, for an additional $25,000 for "Novmeber [sic] Travel Team Expenses" for the AAU team.  In fact, the $25,000 was intended to be funneled

to the student-athlete's father as the second installment of the $100,000 bribe. After the payment was transferred by Company-1 to the AAU team, CODE caused $25,000 to be paid to a bank account controlled by DAWKINS. However, before DAWKINS could make the second $25,000 payment to the athlete's father, the defendants were arrested.

27. The scheme participants also planned to influence another student-athlete to, among other things, attend the University of Louisville, in exchange for payments. For example:

a. On or about July 27, 2017, CHRISTIAN DAWKINS, the defendant, met with CC-2 and a men's basketball coach at the University of Louisville ("Coach-1"), among others. During the meeting, DAWKINS and others discussed making payments to the family of another high school athlete in order to secure his commitment to attend the University of Louisville, and then to retain the services of DAWKINS upon entering the NBA.

b. At that meeting, and in the presence of Coach-1, an envelope containing approximately $12,700 in cash was handed to CC-2, which was intended to be funneled to the family of the athlete. During the same meeting, DAWKINS described the role of another men's basketball coach at the University of Louisville ("Coach-2") in securing money from Company-1 to pay the student-athlete, as part of the scheme described in paragraphs 24 through

14

26, above.  Specifically, DAWKINS explained that while Coach-2 and the University of Louisville were recruiting the student-athlete, DAWKINS asked Coach-2 to call JAMES GATTO, a/k/a "Jim," the defendant, to request that Company-1 provide the money requested by the family of the student-athlete, which Coach-2 agreed to do.

28.  On or about August 23, 2017, in Manhattan, New York, CC-1 received a cash payment of $20,000, of which $5,000 was intended to be provided by CC-1 and CHRISTIAN DAWKINS, the defendant, to CC-2 as part of the scheme to pay money to the family of the student-athlete described in paragraph 27, above.

29.  The bribe payments described herein were designed to be concealed, including from the NCAA and officials at the University of Louisville, in order for the scheme to succeed and for the student-athletes to receive athletic scholarships from the University of Louisville.  As a result of the payments, scheme participants, including, among others, JAMES GATTO, a/k/a "Jim," MERL CODE, and CHRISTIAN DAWKINS, the defendants, and one or more coaches at the University of Louisville, made, intended to make, or caused or intended to cause others to make false certifications to the University of Louisville and the NCAA about the existence of the payments and the known violations of NCAA rules.

## Allegations Related to the University of Miami

30.  Beginning in approximately July 2017, and continuing

15

into at least September 2017, JAMES GATTO, a/k/a "Jim," MERL CODE, and CHRISTIAN DAWKINS, the defendants, and others known and unknown, conspired to illicitly funnel approximately $150,000 from Company-1 to another top high school basketball player expected to graduate in 2018 and/or his family, at the request of and to assist one or more coaches at the University of Miami in securing the student-athlete's commitment to  play basketball at the University of Miami, and to further ensure that the student-athlete ultimately signed with DAWKINS and with Company-1 upon entering a professional league.

31.  On or about August 9, 2017, CHRISTIAN DAWKINS and MERL CODE, the defendants, spoke by telephone about the scheme to pay money to the student-athlete expected to graduate in 2018 and/or his family in order to secure his commitment to play at the University of Miami.  During the call, DAWKINS and CODE discussed the fact that a coach at the University of Miami ("Coach-3") would need to call JAMES GATTO, a/k/a "Jim," the defendant, in order to secure funding from Company-1 to pay a bribe to the athlete and/or his family.  DAWKINS indicated to CODE that Coach-3 was aware of the scheme and "knows something gotta happen for it to get done."

32.  On or about August 11, 2017, JAMES GATTO, a/k/a "Jim," and MERL CODE, the defendants, spoke by telephone about the scheme to pay money to the student-athlete and/or his family in order to

16

secure his commitment to play at the University of Miami.  In particular, during the call:

  a.  CODE informed GATTO that they had "another [University of Louisville] situation" — referring to the payments to a student-athlete to influence him to attend the University of Louisville, as described above in paragraphs 24 through 26 — and explained that the University of Miami wanted to recruit a particular high school athlete for its class of 2018.  GATTO confirmed that he already had learned about the University of Miami's request for assistance in securing the particular student-athlete's commitment to attend the University of Miami, informing CODE that he had spoken to Coach-3 about the student-athlete.

  b.  GATTO indicated his willingness to cause Company-1 to pay money to the student-athlete and/or his family in order to secure his commitment to attend the University of Miami but, with respect to the proposed $150,000 sum, GATTO asked CODE to try to negotiate the bribe payment down to $100,000, such that the amount was commensurate with what they had agreed to funnel from Company-1 to the family of the student-athlete described in paragraphs 24 through 26, above.

  33.  JAMES GATTO, a/k/a "Jim," MERL CODE, and CHRISTIAN DAWKINS, the defendants, among others, including one or more coaches at the University of Miami, intended to conceal the

17

payments to the student-athlete and/or his family from the NCAA
and officials at the University of Miami, in order for the scheme
to succeed and for the student-athlete to receive an athletic
scholarships from the University of Miami.  As a result of the
payments, scheme participants, including, among others, JAMES
GATTO, a/k/a "Jim," MERL CODE, and CHRISTIAN DAWKINS, the
defendants, and one or more coaches at the University of Miami,
intended to make, or intended to cause others to make, false
certifications to the University of Miami and the NCAA about the
existence of the payments and the known violations of NCAA rules.

## COUNT ONE
### (Conspiracy To Commit Wire Fraud)

The Grand Jury charges:

34.  The allegations set forth in paragraphs 1 through 33
of this Indictment are repeated and realleged as if fully set
forth herein.

35.  From at least in or about May 2017, up to and
including in or about September 2017, in the Southern District
of New York and elsewhere, JAMES GATTO, a/k/a "Jim," MERL CODE,
and CHRISTIAN DAWKINS, the defendants, and others known and
unknown, willfully and knowingly did combine, conspire,
confederate, and agree together and with each other to commit
wire fraud in violation of Title 18, United States Code, Section
1343.

36.   It was a part and object of the conspiracy that JAMES
GATTO, a/k/a "Jim," MERL CODE, and CHRISTIAN DAWKINS, the
defendants, and others known and unknown, willfully and
knowingly, having devised and intending to devise a scheme and
artifice to defraud, and for obtaining money and property by
means of false and fraudulent pretenses, representations, and
promises, would and did transmit and cause to be transmitted by
means of wire and radio communication in interstate and foreign
commerce, writings, signs, signals, pictures, and sounds for the
purpose of executing such scheme and artifice, in violation of
Title 18, United States Code, Section 1343, to wit, GATTO, CODE,
DAWKINS, and others known and unknown, including basketball
coaches employed by the University of Louisville and the
University of Miami, participated in a scheme to defraud, by
telephone, email, and wire transfers of funds, among other means
and methods, the University of Louisville and the University of
Miami, by making, agreeing to make, and concealing bribe
payments to high school student-athletes and/or their families
in exchange for, among other things, the student-athletes'
commitment to play basketball for the University of Louisville
and the University of Miami, thereby causing the universities to
agree to provide athletic scholarships to student-athletes who,
in truth and in fact, were ineligible to compete as a result of

19

the bribe payments.

37.    It was a further part and object of the conspiracy
that JAMES GATTO, a/k/a "Jim," MERL CODE, and CHRISTIAN DAWKINS,
the defendants, and others known and unknown, willfully and
knowingly, having devised and intending to devise a scheme and
artifice to defraud, and for obtaining money and property by
means of false and fraudulent pretenses, representations, and
promises, would and did transmit and cause to be transmitted by
means of wire and radio communication in interstate and foreign
commerce, writings, signs, signals, pictures, and sounds for the
purpose of executing such scheme and artifice, in violation of
Title 18, United States Code, Section 1343, to wit, GATTO, CODE,
DAWKINS, and others known and unknown, including basketball
coaches employed by the University of Louisville and the
University of Miami, participated in a scheme to defraud, by
telephone, email, and wire transfers of funds, among other means
and methods, the University of Louisville and the University of
Miami, by making, agreeing to make, and concealing bribe
payments to high school student-athletes and/or their families
in exchange for, among other things, the student-athletes'
commitment to play basketball for the University of Louisville
and the University of Miami, which deprived the University of
Louisville and the University of Miami of their right to control

20

the use of their assets, including the decision of how to allocate a limited amount of athletic scholarships, and which, if revealed, would have further exposed the universities to tangible economic harm, including monetary and other penalties imposed by the NCAA.

(Title 18, United States Code, Section 1349.)

**FORFEITURE ALLEGATION**

38.   As a result of committing the offense charged in Count One of the Indictment, JAMES GATTO, a/k/a "Jim," MERL CODE, and CHRISTIAN DAWKINS, the defendants, shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offense, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense.

Substitute Assets Provision

39.   If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

a.   cannot be located upon the exercise of due diligence;

b.   has been transferred or sold to, or deposited with, a third party;

21

     c.   has been placed beyond the jurisdiction of the

Court;

     d.   has been substantially diminished in value; or

     e.   has been commingled with other property which

cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to 21 U.S.C. §

853(p) and 28 U.S.C. § 2461(c), to seek forfeiture of any other

property of the defendants up to the value of the above

forfeitable property.

          (Title 18, United States Code, Section 981,
         Title 21, United States Code, Section 853, and
         Title 28, United States Code, Section 2461.)

FOREPERSON

November 7, 2017

JOON H. KIM
Acting United States Attorney

22

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

JAMES GATTO, a/k/a "Jim,"
MERL CODE, and
CHRISTIAN DAWKINS

Defendants.

## INDICTMENT

17 Cr.

(18 U.S.C. § 1349.)

JOON H. KIM
Acting United States Attorney.

**A TRUE BILL**

*Bibi Inslan - Bermudez*
Foreperson.

*November 7, 2017*

*11/7/17 - Filed Indictment*
*aa   Case assigned to J Kaplan*

*J Pitman*
*USDJ*